ROHR INDUSTRIES, INC., PLAINTIFF v. UNITED STATES, DEFENDANT

---

[22] As set out previously in this opinion, there was evidence before the Commission that Azufrera was responsible for initiating price decreases in the Tampa market in a number of specific instances.

Court No. 76-8-01939

(Decided October 5, 1979)

*Stein, Shostak, Shostak & O'Hara, Inc. (John N. Politis* at the trial and on the briefs) for the plaintiff.

*Alice Daniel,* Acting Assistant Attorney General; *Joseph I. Liebman,* Attorney in Charge, Field Office for Customs Litigation (*Laura D. Millman* at the trial; *John J. Mahon* on the brief), for the defendant.

FORD, Judge: Plaintiff imported certain turbotransmissions, designated as Voith L 411 brU, for incorporation in turboliner trains operated by Amtrak. The merchandise was classified by Customs upon liquidation as "Other speed changers" under item 680.47, TSUS, as modified by T.D. 68-9, and assessed with duty at $1.12 each plus 17.5 per centum ad valorem.

Plaintiff contends the classification is erroneous and that said merchandise is properly subject to classification as "Torque converters" as provided for in item 680.52, TSUS, as modified by T.D. 68-9, and as such subject to duty at 4.5 per centum ad valorem. This is based upon the premise that the principal purpose of the transmission is its operation as a torque converter. Alternatively, plaintiff contends if the court finds the transmissions do not have a principal purpose, then by virtue of headnote 2, part 4, schedule 6, they should be subject to classification as a "machine not specially provided for" under item 678.50, TSUS, as modified by T.D. 68-9, which provides for duty at the rate of 5 per centum ad valorem. If, however, the court finds neither of the above are applicable, plaintiff asserts the proper classification is under item 690.40, TSUS, as modified by T.D. 68-9, as other parts of self-propelled rail vehicles and as such dutiable at 5.5 per centum ad valorem. Defendant agrees with the latter conten-

tion if the court finds the classification to be erroneous and the other claims not to apply since item 690.40 is more specific than item 678.50.

The pertinent statutory provisions are as follows:

SCHEDULE 6.—METALS AND METAL PRODUCTS

\*　　\*　　\*　　\*　　\*　　\*　　\*

PART 4.—MACHINERY AND MECHANICAL EQUIPMENT

*Part 4 headnotes:*

\*　　\*　　\*　　\*　　\*　　\*　　\*

2. Unless the context requires otherwise, and subject to headnote 1 to subpart A of this part, a multipurpose machine is classifiable according to its principal purpose, but if such a machine is not described in a superior tariff heading as to its principal purpose, or if it has no one principal purpose, it is classifiable in subpart H of this part as a machine not specially provided for.

\*　　\*　　\*　　\*　　\*　　\*　　\*

Subpart H.—Other Machines

\*　　\*　　\*　　\*　　\*　　\*　　\*

| | | |
|---|---|---|
| 678.50 | Machines not specially provided for, and parts thereof_____ | 5% ad val. |

\*　　\*　　\*　　\*　　\*　　\*　　\*

Subpart J.—Parts of Machines

\*　　\*　　\*　　\*　　\*　　\*　　\*

Gear boxes and other speed changers with fixed, multiple, or variable ratios; pulleys, pillow blocks, and shaft couplings; torque converters; chain sprockets; clutches; and universal joints; all the foregoing (except parts of agricultural or horticultural machinery and implements provided for in item 666.00 and parts of motor vehicles, aircraft, and bicycles) and parts thereof:

Gear boxes and other speed changers, and parts thereof:

\*　　\*　　\*　　\*　　\*　　\*　　\*

| | | |
|---|---|---|
| 680.47 | Other speed changers_____ | $1.12 each+ 17.5% ad val. |

\*　　\*　　\*　　\*　　\*　　\*　　\*

| | | |
|---|---|---|
| 680.52 | Torque converters, and parts thereof_ | 4.5% ad val. |

\*　　\*　　\*　　\*　　\*　　\*　　\*

PART 6.—TRANSPORTATION EQUIPMENT

\*　　\*　　\*　　\*　　\*　　\*　　\*

Subpart A.—Rail Locomotives and Rolling Stock

\*　　\*　　\*　　\*　　\*　　\*　　\*

| 690.10 | Self-propelled rail vehicles designed to carry passengers or articles_____ | | | | | | * * * |
|---|---|---|---|---|---|---|---|
| * | * | * | * | * | * | * | |
| | Parts of the foregoing articles: | | | | | | |
| * | * | * | * | * | * | * | |
| | Other: | | | | | | |
| * | * | * | * | * | * | * | |
| 690.40 | Other_____ | | | | | 5.5% ad val. | |

The record consists of the testimony of four witnesses called by plaintiff and one on behalf of the defendant. Six exhibits were received in evidence for plaintiff and four on behalf of the defendant.

Mr. James A. Sieglitz, a customs coordinator for the plaintiff, testified that his duties consisted of reviewing contracts relating to importations and exportations of his company. The witness was familiar with L 411 brU turbotransmissions which were incorporated in the Amtrak turboliners manufactured by his company. Mr. Sieglitz identified a cutaway of one of the two power cars which, together with three other cars, make up a train set. It was received in evidence as plaintiff's exhibit 1. The transmission portion of the exhibit is circled in red.

Plaintiff thereafter called Mr. Wolfgang Paetzold, a well-qualified engineer for Voith Getriebe KG, the manufacturer of the Voith turbotransmission. Mr. Paetzold received an engineering degree from the University of Dresden. The Voith company, according to the witness, is a manufacturer of water turbines, paper machines and transmissions. He was familiar with the turbotransmission involved since in the 1960's there was a demand for high-speed railcars. Mr. Paetzold delivered the parameters of the transmission to the design department of Voith.

The witness identified exhibit 2 as a cross-section view which schematically depicts the transmission. One "X" was placed on exhibit 2 to identify the torque converter, two "X's" were placed on the exhibit which identified the fluid coupling, and three "X's" were placed on the exhibit to identify the hydrodynamic brake.

The turbotransmission, according to Mr. Paetzold, is a special railway transmission designed specially for propelling railcars and interacting with a gas turbine. In the opinion of the witness, the train could not operate without the turbotransmission. The witness was further of the opinion that said transmission was a machine. In addition to the type of transmission involved, mechanical-drive and electrical-drive transmissions are also utilized for railway-propelling systems. In a mechanical drive, the gas turbine is coupled to the wheels by gears which are in constant mesh. In an electrical drive, the gas turbine drives a generator to produce electricity which is supplied to the electric traction motors.

Exhibit 3 is a schematic drawing shaded in various colors to show the components. The yellow area encompasses the hydrodynamic brake and its control elements; the green area the torque converter and its control elements; the pink area the fluid coupling; and the orange area the reversing gear mechanism.

The torque converter, the witness stated, is a device which has as its main purpose the multiplying of torque. Torque is the turning effect of the force at the wheel. The force at the wheel of a locomotive is known as the tractive effort. The purpose of the Voith turbotransmission is to improve the performance characteristic of the gas turbine with a mechanical drive by multiplying the torque. The mechanical drive, while the simplest, has the disadvantage of generating very low torque at low and medium speeds, and the acceleration is very poor. In addition, it is difficult for a train with a mechanical drive to maintain high speed on a grade due to the limited torque generated by the gas turbine. The turbotransmission exerts its maximum torque at zero speed of the railcar. The torque multiplication factor is approximately 7, which means the torque at zero is seven times higher than the torque at maximum speed.

The witness, in explaining how the turbotransmission operates, stated that when the turboengine is first started there is no oil in the torque convertor and, therefore, no torque is being transmitted to the wheels of the railcar. The parts shown in red on exhibit 2 rotate when the turboengine is running. In order to provide motion for the train, fluid is sucked from the oil pump into the torque converter. The oil then strikes the turbine runner which causes it to rotate. The turbine runner is connected by means of gears to the wheels of the train which causes it to move. When the train reaches 70 percent of its maximum speed, the turbotransmission automatically changes over from the torque convertor to the fluid coupling, which has a higher efficiency at this speed range than the torque converter. The witness indicated the top speed of the railcar is 125 miles per hour.

Mr. Paetzold testified that the hydrodynamic brake is used to achieve the braking force without the use of a mechanical brake. When the hydrodynamic brake is filled with oil, the train is decelerated because the stator is standing still which retards the rotor of the hydrodynamic brake. This operation creates heat which is dissipated in the heat exchanger and enables the car to be braked, minimizing the wear and tear on the mechanical brake. The torque converter is unable to transmit torque in a reverse direction so the reversal capability is accomplished by a series of gears. This is necessary since the power car at the end of the train must use the reversal mechanism to assist in the movement of the train. In addition, an

electrical motor is incorporated since the turboliner operates in New York tunnels, requiring third-rail equipment for use on the train.

Mr. Paetzold testified further that there are input and output gear sections incorporated in the transmission. They are both fixed-speed reducing gears also known as constant speed changers. The input gears connect to the input shaft and are designed to reduce the input speed of the turbine engine of 5,700 to 4,500 revolutions per minute, the speed at which the transmission absorbs the required power from the gas turbine. In the output section of the transmission, the maximum speed of 125 miles per hour is accomplished by 2,200 revolutions per minute at the output shaft. The speed changer is designed in order to produce this speed.

According to the witness, the turbotransmission has no other use than with self-propelled rail vehicles and is necessary for the efficient operation of said vehicles. The witness was of the opinion that the principal function of the turbotransmission is its torque multiplication which is provided by the torque converter. The turbotransmission could operate without the hydrodynamic brake inasmuch as the train has mechanical brakes to perform the braking function.

The witness testified there was no specific relationship between torque and speed when the turbotransmission is in the torque converter range. However, he indicated that as output speed increases, the output torque decreases. Accordingly, the witness was of the opinion that the turbotransmission was not a speed changer since its purpose was to multiply torque and not change speed. The main objective of the turbotransmission is to produce torque, and change of speed was subservient to the torque.

Plaintiff then called Mr. Jerome R. Pier, an engineer presently employed by Westinghouse Air Brake Division of WABCO as manager of passenger transit marketing. Prior to that, Mr. Pier was employed by plaintiff as manager of special projects which involved examination of the turboliner program, and subsequently was appointed manager of the program. He received his B.A. in mechanical engineering from Pennsylvania State University, has written a number of technical papers, and holds 12 patents which are related to the rail transportation field. He testified the turbotransmission was essential to the self-propelled turboliner and necessary to multiply the torque. Mr. Pier testified that speed does not play a direct role in the torque converter. In his opinion, a train could operate without the hydrodynamic brake since it is supplemental to the friction brake. In his opinion, the turboliner could also operate without the fluid coupling since it merely increases the efficiency of the turboliner when it is operating at a higher speed. The turboliner could not, in his opinion, operate without the torque converter.

According to Mr. Pier, a speed changer is a device for changing speed of an output shaft in relation to the input shaft, and when there is a change in speed there is an inverse change in torque. Therefore, when speed increases torque decreases. Mr. Pier further testified the torque converter is not a speed changer since its primary function is to multiply torque.

Mr. John W. Rogers, an engineer employed by plaintiff, testified that he graduated from Cornell University with a B.A. in electrical engineering. He was familiar with the transmission since it was his responsibility to see that it was installed in the train and to prepare test procedures. Prior to his association with plaintiff, he was employed by United Aircraft which also produced a turboliner. The United Aircraft train had a direct-drive transmission system between the gas turbine and the wheels. One of the disadvantages of the United Aircraft turbotrain was that it had limited torque at low speeds, which resulted in slower acceleration. The witness was familiar with the torque converter and stated that it served the function of multiplying input torque to the output shaft.

Mr. Andrew F. Charwat, a professor at the University of California, Los Angeles, testified on behalf of the defendant. His testimony related to the torque characteristics of a cone pulley. The witness had no practical experience with turbotransmissions of the type involved.

It is evident to the court, based upon the evidence of record and a consideration of the multitude of cases which have determined for tariff purposes the term "machines," as well as the agreement of both parties, that the Voith turbotransmissions are in fact machines. In view of headnote 2, part 4, schedule 6, the primary question is whether the transmission is a multipurpose machine, a speed changer or torque converter.

The record establishes the turbotransmission is composed of a number of components which perform varied and separate functions as follows:

1. Torque converter which multiplies torque to improve acceleration.

2. Hydrodynamic brake to assist the friction brake of the train.

3. A reversing mechanism which permits the railcar to operate in both directions.

4. A fluid coupling which is used after the train reaches a specific speed and which improves efficiency at high speeds.

5. Fixed ratio reducing gears (speed changer) at the input to the transmission. This reduces the rotation of the turbine to make it compatible with the input speed of the transmission.

6. Fixed ratio reducing gears (speed changer) reduce the output rotation speed of the transmission compatible with the rotational requirement of the drive wheels of the railcar.

7. A coupling device which enables the train to operate by an electric motor when used in the tunnels at New York City.

8. Various other components such as filling pumps, governors, sensors, and an oil cooler fan.

In view of the foregoing, it is apparent the Voith turbotransmission is a multipurpose machine. It is likewise obvious that the mechanism contains a torque converter, item 1, and two speed changers, items 5 and 6, as well as other components. Headnote 2 requires the court to determine whether there is one principal purpose. While the transmission contains among other components a torque converter and two speed changers, it is neither of these for tariff purposes. The principal purpose of the transmission is to transmit power from the turboengine to the wheels of the train. Power transmissions are not described in the superior tariff heading of subpart J and, accordingly, following headnote 2, said articles should fall within item 678.50.

However, item 678.50 is a basket provision which is not as specific as the alternatively claimed provision for parts of self-propelled rail vehicles as provided for in item 690.40. The court notes general interpretative rule 10(a)[1] which provides the headnote involved is subject to the rules of statutory interpretation and judicial rulings. It is apparent on its face that item 690.40 is more specific than item 678.50. Since defendant does not dispute the transmissions to be machines and since item 678.50 has been held not to be a specific provision within the scope of general interpretative rule 10(ij), *Ideal Toy Corporation* v. *United States*, 58 CCPA 9, C.A.D. 996, 433 F. 2d 801 (1970), the court finds the Voith transmissions to be properly subject to duty at 5.5 per centum ad valorem under item 690.40 as alternatively claimed.

Judgment will be entered accordingly.

(C.D. 4825)

BORDER BROKERAGE CO., INC., PLAINTIFF *v.* UNITED STATES, DEFENDANT

---

[1] 10. *General interpretative rules.*—For the purposes of these schedules—

(a) The general, schedule, part, and subpart headnotes, and the provisions describing the classes of imported articles and specifying the rates of duty or other import restrictions to be imposed thereon are subject to the rules of interpretation set forth herein and to such other rules of statutory interpretation, not inconsistent therewith, as have been or may be developed under administrative or judicial rulings.